# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Misc. No. 02-295 (TFH) |
| | ) |
| KPMG LLP, | ) |
| | ) |
| Respondent. | ) |

### PETITIONER'S OBJECTIONS TO REPORTS AND RECOMMENDATIONS OF SPECIAL MASTER

STUART D. GIBSON
ISAAC D. PAXMAN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227, Ben Franklin Station
Washington, D.C. 20044
(202) 307-6586, 353-2260

OF COUNSEL:

ROSCOE C. HOWARD, JR.
United States Attorney

## TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL POSTURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.      KPMG Produces Another Supplemental FLIP/OPIS Log
             Last Month . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      2.      KPMG Delays Disclosing to the IRS its Involvement in Developing
             and Promoting a Specific Listed Tax Shelter, Until After it Learns
             the IRS is Aware that KPMG Promoted that Tax Shelter . . . . . . . . . . . . . . 5

      3.      KPMG Attempts to Conceal its Role as a Tax Shelter Promoter . . . . . . . . 10

             A.      Facts Uncovered by the Senate Permanent Subcommittee on
                      Investigations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

             B.      The Special Master Learns that KPMG Misrepresented
                      the Contents of Allegedly Privileged Documents . . . . . . . . . . . . . . 14

SPECIFIC OBJECTION TO SPECIAL MASTER'S REPORTS

I.      On this Record, the Court Should Reject All Claims of Privilege Asserted
       Under §7525 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.     KPMG Should Produce the Documents that the Special Master Did Not
       Discuss in Either Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.    In Any Event, KPMG Should Produce Each Document that Discusses Tax
       or Legal Advice, Where the Document Itself Does Not Indicate that the
       Discussion was Based Upon Facts Communicated in Confidence by the
       Client . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.    KPMG Should Produce Documents that Support Benefits Claimed on Tax
       Returns Filed With the IRS and Documents Disclosed to Non-Privileged
       People . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,            )
                                     )
            Petitioner,              )
                                     )
    v.                               )   Misc. No. 02-295 (TFH)
                                     )
KPMG LLP,                            )
                                     )
            Respondent.              )

PETITIONER'S OBJECTIONS TO REPORTS AND
RECOMMENDATIONS OF SPECIAL MASTER

INTRODUCTION

Petitioner the United States of America, by and through its attorneys, files the

following objections to the Special Master's Initial Report and Recommendation, filed

January 27, 2003 (Initial Report), and the final Report and Recommendation, filed

October 10, 2003 (Final Report).  In support of these objections the petitioner relies upon

the record in this case, including the Memorandum Opinion of this Court filed

December 20, 2002, the Third Declaration of Michael A. Halpert filed herewith, and

these objections.

For the reasons discussed below and in previous filings, the United States seeks

not only an Order generally enforcing these nine summonses.  It also seeks an Order

specifically directing KPMG to produce all the documents that the Court in its

December 10, 2002 Memorandum Opinion and the Special Master in his Reports and

Recommendations determined are not privileged; directing KPMG to produce the

documents discussed below for which, we submit, the Special Master incorrectly

applied this Court's December 10, 2002 Order; and directing KPMG to identify the tax

shelter customers whom it has, thus far, refused to identify to the IRS.  The United

States proved its entitlement to that relief nearly 18 months ago.

<u>PROCEDURAL POSTURE</u>

On July 9, 2002, the United States filed this petition to enforce nine IRS

summonses served in January, March and May 2002, as part of its examination of

KPMG's tax shelter activities.  At the time of the petition, KPMG had provided only one

privilege log for the documents it was withholding in response to the nine summonses.

That log was deficient in many ways: (1) it addressed only documents sought in the

FLIP/OPIS summons, but not all of those documents; (2) it did not address documents

responsive to the other eight summonses that  KPMG was withholding on claims of

privilege – it did not begin to produce logs for the other summonses until April 2003;

and (3) its sparse, conclusory factual assertions were not supported by sworn evidence.

The Court held that the one log was not sufficient to support KPMG's privilege claims.[1]

In that Opinion, the Court referred to a Special Master all the documents listed in

that single privilege log, and held the other eight summonses in abeyance.  The Special

Master then embarked on a task which an adequate privilege log would have largely

eliminated.  Now, as a result of the Special Master's   recommendation to reject many of

KPMG's privilege claims, the United States appears on the verge of finally obtaining

documents that the IRS sought from KPMG more than two years ago  at the beginning

---

[1]Memorandum Opinion, December 20, 2002, pp. 4-6.

of its  investigation of KPMG's liability for tax shelter promoter penalties.  The United

States'  efforts to obtain other documents properly summoned continues, while KPMG

uses delaying tactics to frustrate the IRS's examination.

Three specific circumstances demonstrate KPMG's concerted efforts to thwart

the IRS's examination:

(1)    Only last month, KPMG again supplemented its FLIP/OPIS privilege log,

to cover documents whose very existence KPMG did not disclose for the first 16 months

of this lawsuit.

(2)    KPMG continues to argue that it did not develop or promote tax shelters,

as a way of resisting compliance with these summonses.  But that argument simply

continues a pattern in which KPMG does not disclose the full extent of its involvement

in developing and promoting specific tax shelters until after it knows the IRS is aware of

that involvement.

(3)    KPMG has not accurately described a number of important documents in

the one deficient privilege log that is now before the Court.

These actions by KPMG not only underlie and support our specific objections to

the Special Master's Reports, they undercut and discredit the objections KPMG has

raised in this case, as well as whatever objections KPMG might now raise in response to

the Special Master's Reports.  They demonstrate a concerted pattern of obstruction and

non-compliance, threatening the integrity of the IRS examination process, and the

prompt conclusion of this lawsuit.

(1)    <u>KPMG Produces Another Supplemental FLIP/OPIS Log Last Month</u>.

On November 5, 2003, nearly a month after the Special Master issued his Final Report, KPMG produced yet **another** supplemental FLIP/OPIS privilege log. That log comes on the heels of a series of supplements to the FLIP/OPIS privilege log, most recently updated a year ago in September 2002. The latest, but not necessarily the last, supplemental log discloses for the first time an additional 21 documents, and claims that those documents are privileged. The Court should simply order KPMG to produce all the documents that it recently identified as allegedly privileged. After nearly two years of dodging the IRS and this Court, KPMG should not be allowed to assert new reasons it is not complying with these summonses.

On July 12, 2002, the Court ordered KPMG to show cause why the summonses should not be enforced. With the parties' agreement, the Court gave KPMG until August 26, 2002 to file all the documents and affidavits on which it was relying to resist enforcement of these summonses. The Court further ordered,

> . . . only those issues raised by motion or brought into controversy by the responsive pleadings and supported by affidavit(s) will be considered at the return of this Order, and . . . any allegations in the Petition not contested by affidavit(s) will be considered as admitted for the purpose of this enforcement proceeding. . .

KPMG has had more than ample opportunity to assert its objections. Having waited until **after** the Special Master reported the results of his multi-hundred-hour review of the FLIP/OPIS documents, it is too late for KPMG to identify yet more documents it seeks to withhold. To wait more than one year after the Court ordered

KPMG to file all its papers, and 11 months after the Court ordered KPMG to produce all the allegedly privileged documents to the Special Master, is simply unconscionable.  By waiting to produce this additional log, KPMG has waived its right to assert those new privilege claims.

(2)    KPMG Delays Disclosing to the IRS its Involvement in Developing and Promoting a Specific Listed Tax Shelter, Until After it Learns the IRS is Aware that KPMG Promoted that Tax Shelter.

While over the past year KPMG has produced additional documents sought in these summonses – and in other summonses that we did not file suit to enforce – those productions have been untimely, so as to delay the IRS's investigation.  KPMG's dilatory conduct reinforces our assertion that KPMG has asserted unsupportable privileges primarily to thwart the IRS's investigation.  Indeed, as shown below, KPMG managed to conceal from the IRS its involvement in promoting one specific "listed" tax shelter, until after KPMG became aware that the IRS knew of it.

KPMG has long known that the IRS had issued summonses seeking information about transactions that it has "listed" as potentially abusive tax shelters under the authority of 26 U.S.C. §§ 6111 and 6112.   Nonetheless, KPMG continues to assert – contrary to literally volumes of evidence contained in its own files – that it has never developed, sold or promoted a tax shelter.  KPMG has tried to cloak its withholding of documents with a privilege by asserting that KPMG, "is not a tax shelter organizer, but a professional firm whose tax professionals provide advice and counseling on a one-on-

one basis to clients and prospective clients concerning the clients' tax situations."[2]  This

illusion has also led KPMG to delay – sometimes for years – producing documents

about its promotion of tax shelters that the IRS had not previously been aware of.

    The most egregious example of this occurred a few months ago.  In late August

2003, KPMG for the first time identified and produced to the IRS information about a

listed tax shelter that it had developed and promoted in 1998, 1999 and 2000.  Called the

"Short Option Strategy," or SOS, this KPMG-promoted tax shelter is the same or

substantially similar to the transactions listed by the IRS in Notice 2000-44, which was

issued in August 2000.[3]  Among the summonses the IRS had issued to KPMG was a

summons demanding that KPMG produce documents and testimony about all

transactions described in Notice 2000-44, and all transactions substantially similar to

them.[4]

_____

    [2]See, e.g., KPMG's Answer to Petition, ¶24, incorporating the Objections listed in
Exhibits A - I, Supplemental Objections, ¶1.  Not only does the IRS reject that claim, as
contrary to the evidence it has developed, as we will see below, a Subcommittee of the
United States Senate has recently released an investigative report and supporting
evidence that conclusively refute that assertion as well.

    [3]KPMG may assert that the SOS tax shelter was not the same transaction as the
one listed in Notice 2000-44.  But whether or not that argument has merit, the SOS tax
shelter was virtually identical to the listed transaction, so much so that in August 2003
KPMG "disclosed" it to the IRS in response to the Notice 2000-44 summons.

    [4]We did not petition the Court to enforce that summons, because in 2002 KPMG
assured the IRS that it had fully complied with that summons.  This incident
demonstrates why it is important for the Court to order KPMG to comply – if KPMG
fails to comply then the United States can ask the Court to hold it in contempt.  Without
an order directing KPMG to comply, it can take as long as it chooses to comply, with no
accountability to the court or recourse to the IRS.

In response to that summons (the Notice 2000-44 Summons) KPMG at first told the IRS that it did not promote any of the transactions listed in that Notice and, to the extent it did, it was producing all responsive documents.[5]  Taking that representation as true, the United States did not petition this Court to enforce the Notice 2000-44 summons.

But KPMG clearly **did** promote the SOS strategy, and clearly **knew** that the SOS strategy was a tax shelter listed in Notice 2000-44.  In a draft internal KPMG memo from May 2001, obtained and recently made public by the U.S. Senate Permanent Subcommittee on Investigations, KPMG said that it had specifically selected the SOS strategy to replace another tax shelter called BLIPS, adding that KPMG had decided to stop marketing BLIPS even before the IRS listed it in Notice 2000-44.   KPMG's memo then went on to discuss KPMG's decision to stop marketing the SOS tax shelter:

> The fiscal '01 [Innovative Strategies practice] revenue goal was $38 million and the practice has delivered $16 million through period 10.  **The shortfall from plan is primarily attributable to the August 2000 issuance of Notice 2000-44. This Notice specifically described both the retired BLIPS strategy and the then current SOS strategy.  Accordingly, we made the business decisions to stop the implementation of "sold" SOS transactions and to stay out of the "loss generator" business for an appropriate period of time.**[6]

---

[5]As will be seen below, when the IRS first confronted KPMG with questions about its involvement in the SOS tax shelter, KPMG claimed that its role was limited to preparing tax returns, and giving advice about return preparation.

[6]Exhibit 38, Minority Staff of Permanent Subcomm. on Investigations of S. Comm. on Governmental Affairs, 108th Cong., Rep. on U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals (Comm. Print 2003), "Subcommittee Report." (copy attached) (emphasis added)

Despite KPMG's decision to stop marketing SOS – "for an appropriate period of time" – because SOS was listed in Notice 2000-44, KPMG did **not** at first identify the SOS tax shelter to the IRS as responsive to the Notice 2000-44 Summons (or any other summons).  Indeed, the IRS was not at first even aware that KPMG had developed and sold the SOS tax shelter.

The IRS's first indication that KPMG may have had something to do with the SOS tax shelter came not from KPMG, but from other sources.  Having heard of this shelter for the first time in May 2003, Revenue Agent Halpert asked KPMG's attorney whether KPMG had been involved in developing or promoting the SOS tax shelter.  KPMG's attorney told Halpert that KPMG's role was limited to preparing tax returns and giving advice about tax return preparation for clients who had participated in SOS transactions.[7]

It was not until August 27, 2003, when 17 boxes of documents from KPMG arrived at Halpert's office, that the IRS finally learned that KPMG was involved in developing and selling the SOS tax shelter.  Another 3 boxes of documents that provided more information about the extent of that involvement arrived in the ensuing three weeks.[8]

Significantly, KPMG did not voluntarily produce a list of SOS customers – Halpert had to ask for it separately, even though the Notice 2000-44 summons required

_____

[7]Third Halpert Declaration, ¶¶ 6-7.

[8]Id.. ¶¶8, 12.

it.[9]  KPMG did not produce the customer list until September 17, 2003.[10]  Why is the

timing of that disclosure significant?  By the time KPMG told the IRS that it had

promoted the SOS tax shelter, and disclosed its customer list (as statute and regulation

required it to do within 10 days of the IRS's December 2001 request), the "normal"

three-year statute of limitations had likely expired on the IRS's ability to disallow the

tax benefits claimed by many of KPMG's customers.[11]  KPMG notified its customers

before disclosing their names to the IRS – two customers actually sued KPMG to

prevent it from telling the IRS that they had participated in the SOS tax shelter.[12]  These

events continue a disconcerting pattern of KPMG not producing information timely,

and not advising the IRS of information that the IRS is not already aware of.

**This is one reason that it is critical for this Court to promptly enter an Order**

**directing KPMG to comply in full with these summonses.  Indeed, until such an**

**Order is entered, KPMG apparently believes it is under no compulsion to make full**

---

[9]Id., ¶¶ 8-9.

[10]Id., ¶ 10.

[11]The IRS generally has three years from the date a tax return is filed to assess a deficiency, or issue a notice of deficiency.  26 U.S.C. §§ 6501, 6503.  Many taxpayers file a Form 4868, which gives them an automatic extension of time to August 15.  Thus the "normal" statute of limitations likely expired on August 15, 2003 for taxpayers that had filed their 1999 income tax returns under the automatic extension.  KPMG did not disclose their identities to the IRS until September 17, 2003.

[12]John Doe 1, et al. v. KPMG LLP, Case No. 3:03-cv-2036 (N.D. Tex.).  But see, Doe v. Wachovia Corporation, 268 F.Supp.2d 627 (W.D.N.C. 2003), in which the court rejected claims of customers in the KPMG-promoted SOS tax shelter, who sued to prevent the IRS from discovering their identities.

**disclosure to the IRS, or to provide information in a timely manner.  KPMG has had**

**more than enough time and opportunity to comply.  It is now time to order KPMG to**

**comply in full, and to impose sanctions for its failure to comply.**

(3)    KPMG Attempts to Conceal its Role as a Tax Shelter Promoter

We also believe KPMG's has taken steps since the IRS investigaton began, that

have been designed to hide its tax shelter activities.  These actions cast doubt over

KPMG's privilege assertions.

    A.    Facts Uncovered by the Senate Permanent Subcommittee on
          Investigations.

For the better part of the last year and a half, the Permanent Subcommittee on

Investigations of the United States Senate Committee on Governmental Affairs

conducted its own investigation into the development and promotion of abusive tax

shelters.  Among other things, the Subcommittee concluded – as did the IRS – that

KPMG developed and promoted the FLIP and OPIS tax shelters, KPMG's claims to the

contrary notwithstanding.  The Subcommittee released the report of its Minority Staff –

*U.S. Tax Shelter Industry: The Role of Accountants, Lawyers and Tax Professionals* – on

November 17, 2003, in advance of two days of committee hearings held November 18

and 20, 2003.[13]   The report of that investigation focused on four tax shelters that KPMG

developed and marketed beginning in 1996:  FLIP, OPIS, BLIPS and SC[2].  All four of

those shelters are the subject of summonses at issue in this case.  FLIP and OPIS are the

_____

       [13]The full text of the report, cited in note 6,  can be found on the Subcommittee
website at:  www.senate.gov/~govt-aff/_files/TAXSHELTERREPORTFINAL.pdf

tax shelters for which KPMG withheld the documents discussed in the Special Master's Reports.

The report, supported by over 135 exhibits, puts into context KPMG's tax shelter development and promotion activities.[14]  The Subcommittee Report paints a very different picture of KPMG and its development and marketing of tax shelters than KPMG's responses and objections to these summonses would suggest.[15]  In particular, after reviewing volumes of KPMG documents and e-mails, and interviewing KPMG's employees involved in the development and marketing of tax shelters and KPMG's top executives, the Subcommittee Staff reached a number of conclusions about KPMG's development and marketing of abusive tax shelters:

> 1.    Although KPMG denies being a tax shelter promoter, the evidence establishes that KPMG has devoted substantial resources to, and obtained significant fees from, developing, marketing, and implementing potentially abusive tax shelters that U.S. taxpayers might otherwise have been unable, unlikely or unwilling to employ, . . .
>
> 2.    KPMG devotes substantial resources and maintains an extensive infrastructure to produce a continuing supply of generic tax products to sell to multiple clients, using a process which pressures its tax professionals

---

[14]KPMG has consistently asserted, here and before the Subcommittee, that it does not develop, promote or market tax shelters to multiple clients.  See, e.g., note 3, above. The Subcommittee Report conclusively refutes that claim, relying on voluminous KPMG documents, and the statements of key KPMG employees and managers.

[15]Attached to these Objections as Appendix A is a non-exhaustive compilation of excerpts from documents obtained by the Subcommittee that reflect the views of KPMG's tax professionals that KPMG was, indeed, marketing the FLIP and OPIS tax shelters to potential customers.

to generate new ideas, move them quickly through the development process, and approve, at times, potentially abusive or illegal tax shelters.

3.      KPMG uses aggressive marketing tactics to sell its generic tax products, including by turning tax professionals into tax product salespersons, pressuring its tax professionals to meet revenue targets, using telemarketers to find clients, using confidential client tax data to identify potential buyers, targeting its own audit clients for sales pitches, and using tax opinion letters and insurance policies as marketing tools.

4.      KPMG is actively involved in implementing the tax shelters which it sells to its clients, including by enlisting participation from banks, investment advisory firms, and tax exempt organizations; preparing transactional documents; arranging purported loans; issuing and arranging opinion letters, providing administrative services; and preparing tax returns.

5.      **KPMG has taken a number of measures to conceal its tax shelter activities from tax authorities and the public, including by refusing to register potentially abusive tax shelters with the IRS, restricting file documentation, and using improper tax return reporting techniques.**[16]

The record developed in this case fully supports the Subcommittee's findings. For example, the Declaration of Joseph Jacoboni filed in this case proves that he – like so many of KPMG's tax shelter customers – did not seek out KPMG for tax advice.  **KPMG solicited him!**  The rest of the Committee's extensively documented findings, supported in large part by evidence obtained from KPMG, lend further support to the findings summarized above.  Indeed, since the outset of this case we have explained

---

[16]Subcommittee Report, pp. 4-5, Findings 2, 3, 4, 5, and 9 (emphasis added).

that KPMG cannot assert the tax practitioner or attorney-client privilege to withhold documents that relate to its development and marketing of tax shelter products.[17]  Now that the full extent of KPMG's efforts is beginning to come to light, the Court should reject KPMG's claims that defy logic, common sense, and its own documents.  Because KPMG was in the business of developing and selling tax shelter products, the §7525 privilege does not protect any of the documents that pertain to those activities – its argument that it was merely responding to requests for tax advice from existing clients is baseless.

In one key aspect, the Subcommittee Report found that KPMG engaged in the same tactics of evasion, delay and denial that it used first before the IRS and now in this Court.  For example, KPMG officials at first denied to Subcommittee investigators that KPMG used telemarketers to sell at least one of its tax shelters, SC$^2$.[18]  Those denials persisted right up until the Subcommittee staff presented KPMG with conclusive evidence to the contrary:

> When KPMG representatives were first asked about
> KPMG's use of telemarketers, they initially told the
> Subcommittee staff that telemarketing calls were against
> firm policy.  When asked about the Indiana cold call center

---

[17]United States' Reply Memorandum, pp. 15-18.

[18]The SC$^2$ tax shelter was designed to be marketed to subchapter S corporations. The Subcommittee Report, pp. 48-62, describes in great detail the efforts that KPMG undertook to identify potential subchapter S corporation clients and sell the SC$^2$ tax shelter to them.  KPMG went "**so far as to recommend that KPMG tax professionals employ such hard-sell tactics as making misleading statements to their clients**," to convince reluctant prospects to buy this tax shelter.  (Id., pp. 58-60, emphasis added)

which KPMG had been operating for years, the KPMG representatives said that the center's telemarketers sought to introduce new clients to KPMG in a general way and did little more than arrange an appointment so that KPMG could explain to a potential client all the services that KPMG offers. When confronted with evidence of telemarketing calls for SC[2], the KPMG representatives acknowledged that a few calls on tax products might have been made by telemarketers at the cold call center, but implied such calls were few in number and rarely led to sales.  In a separate interview, when shown documents indicating that, in the case of SC[2], KPMG telemarketers made calls to thousands of S corporations across the country, the KPMG tax professional being interviewed admitted these calls had taken place.[19]

This progression is similar to the manner in which KPMG was brought to disclose the SOS shelter.  And part of the pattern in which KPMG has tried to misdirect the investigation.B.

    B.    <u>The Special Master Learns that KPMG Misrepresented the Contents of Allegedly Privileged Documents</u>.

KPMG not only misrepresented to Congress its role as a tax shelter promoter, it has done so to this Court as well.  The Special Master's Final Report shows that KPMG continues to try and conceal its tax shelter activities from the IRS, using one technique that is not mentioned in the Subcommittee Report:  **Withholding documents summoned by the IRS by incorrectly describing the documents to support dubious claims of privilege.**

--------

[19]Subcommittee Report, p. 58 (footnotes omitted).

The Special Master's Final Report discusses in detail many documents that KPMG improperly seeks to withhold on the basis of various spurious privilege claims.[20] The Special Master explains why each one of them is not privileged.  But one document stands out as not only refuting the claimed privilege, but as supporting the view that KPMG concealed and misrepresented the true nature of its tax shelter development and promotion activities.  It bears special mention here:

**Document 1069**

KPMG withheld Document 1069, a series of e-mails from March 2001, relying on the tax advice privilege codified in 26 U.S.C. §7525.  In the index, KPMG describes the document as, "Confidential e-mail communication from KPMG . . ., forwarded to and among KPMG personnel: . . . discussing application of KPMG strategic analysis to [two named] KPMG clients . . . .".

But KPMG's description does not, in fact, describe what the document is.  After reviewing Document 1069, the Special Master observed the following disconnect between the document and KPMG's description of the document:

> This series of e-mails together with an attachment are said to be a discussion of the application of a strategic analysis for a named client.  Although the e-mails and attachment discuss a specific marketing devi[c]e, **there is no discussion of tax advice to any client, much less a named client.  This appears to be a notification from one section of KPMG to another advising of a service that is available**

---

[20]As will be discussed below, the Special Master concluded, in total, that nearly 60% of the documents listed in the FLIP/OPIS privilege log were not privileged at all, and that another 5% of the documents contained at least some unprivileged material.

> **to help evaluate client investments and protect market
> share from slippage to competitors who offer a similar
> service.[21]**

Somewhat ironically, the Special Master's description dovetails rather closely

with the Subcommittee Report, in particular with its conclusion that KPMG maintains

an extensive infrastructure to develop and mass market its tax shelter products.  At

pages 45-47 of its report, the Subcommittee staff described communication efforts that

KPMG made to reach its professional staff, to inform them of the availability of tax

shelter products.  Those efforts seem to parallel the information contained in e-mails

like Document 1069, and in others described by the Special Master (and determined not

to be privileged).

The Special Master reviewed Document 1069 only because KPMG had failed to

submit a proper privilege log to the IRS and the Court.  Without the Special Master's

laborious document-by-document review, the Court and the IRS would never have

known that KPMG misrepresented its unprivileged tax shelter marketing activities as

privileged communications.

Similar – though perhaps not quite as blatant – misrepresentations abound in the

FLIP/OPIS log.  Many of these misrepresentations attempt to place a cloak of privilege

on discussions about the development and marketing of the FLIP and OPIS tax shelters,

conducted between KPMG and the Brown & Wood law firm.  While under other

circumstances one might confidently assume that communications between an

---

[21]Final Report, p. 49 (emphasis added).

accounting firm and a law firm about specific clients might be privileged, the facts here turn that assumption on its head.  For example, KPMG withheld as subject to the attorney-client, the §7525 and the work product privileges Document 1001, that it described as follows: "E-mail communication between KPMG, Angie Napier and Jeffrey Eischeid, referring to conversations with R.J. Ruble, Esq., Brown & Wood LLP, about tax advice regarding the transaction."

But after he looked at the document, the Special Master concluded that the log completely misrepresented the document and the nature of the relationship between KPMG and Brown & Wood.  He observed in pertinent part, "**The lawyer referred to in the e-mails is one with whom KPMG had a business or marketing relationship and not a true attorney client relationship.  Moreover, nothing in the exchange discloses any facts or opinion to or from a lawyer.**"[22]

If the Special Master had had the benefit of the Subcommittee Report, he might have reached that conclusion without even having to review all the documents involving Mr. Ruble.  In its report, the Subcommittee found that, rather than acting as a "traditional" law firm, Brown & Wood simply became part of KPMG's overall marketing strategy for the FLIP tax shelter:

> KPMG was apparently so convinced that an outside legal opinion increased the marketability of its tax products, that in the case of FLIP, **it agreed to pay Sidley Austin Brown & Wood a fee in any sale where a prospective buyer was told that the law firm would provide a favorable tax**

---

[22]Final Report, p. 68.

> **opinion letter, regardless of whether the opinion was
> actually provided**.  A KPMG tax professional explained in
> an e-mail: "Our deal with Brown & Wood is that if their
> name is used in selling the strategy they will get a fee.  We
> have decided as a firm that B&W opinion should be given in
> all deals."  This guaranteed fee arrangement also provided
> an incentive for Sidley Austin Brown & Wood to refer clients
> to KPMG.[23]

On the basis of this information, any communications between KPMG and

Brown & Wood were made in furtherance of developing and marketing tax shelters.

Furthermore, any communications between the tax shelter participants and Brown &

Wood and shared with a tax shelter promoter are not privileged.

In light of the information already contained in this voluminous record, the

information developed by the Subcommittee, and the inordinate delay in KPMG's

compliance with a series of validly-issued summonses, the United States urges the

Court to promptly Order KPMG to produce all the documents that the Court in its

December 10, 2002 Memorandum Opinion and the Special Master in his Reports and

Recommendations determined are not privileged; Order KPMG to produce the

documents discussed below for which, we submit, the Special Master misapplied this

Court's December 10, 2002 Order; and Order KPMG to identify the tax shelter

customers whom it has, thus far, refused to identify to the IRS.

---

[23]Subcommittee Report, p. 61 (footnotes omitted) (emphasis added).  Third
Halpert Decl., ¶13, Exh. A.

SPECIFIC OBJECTIONS TO SPECIAL MASTER'S REPORTS

I.

ON THIS RECORD, THE COURT SHOULD REJECT
ALL CLAIMS OF PRIVILEGE ASSERTED UNDER §7525

The evidence in this record proves that KPMG was in the business of developing

and marketing tax shelters on a large-scale basis to clients who were otherwise unaware

that these shelters existed.[24]  Indeed, because KPMG did not offer any evidence to

support its clients' claims of privilege as to these documents, the only evidence in this

record on the FLIP/OPIS privilege log supports this conclusion.[25]

In contrast, the evidence which the United States has offered with the Petition,

the Reply and these Objections proves that KPMG was actively developing and selling

tax shelters, including the FLIP and OPIS shelters.  As such, KPMG cannot credibly

claim that it has proven the elements of the "tax practitioner privilege" established in

§7525.  As this Court ruled in its December 20, 2002 Memorandum Opinion, one

essential element of that privilege – as with the attorney-client privilege – is that the

information sought to be withheld must have been communicated by a client or

---

[24]See, Appendix A to these Objections.

[25]The FLIP/OPIS privilege log was not made under penalty of perjury.  In
addition, the only declarations that KPMG offered in support of the privilege claims are
those which support its **own** claims of privilege.  This record contains no sworn
testimony which might prove any of the elements of the §7525 privilege claims asserted
on behalf of KPMG's customers.

potential client to the practitioner, in confidence, for the purpose of seeking tax advice.[26]

There is not a shred of evidence in this record to support KPMG's claim that any

information it seeks to withhold on the basis of this privilege meets that requirement.

The Court should, therefore, reject any recommendation from the Special Master which

proposes to withhold documents based upon the §7525 privilege.

II.

KPMG SHOULD PRODUCE THE DOCUMENTS THAT THE<br>SPECIAL MASTER DID NOT DISCUSS IN EITHER REPORT

The Special Master did not discuss a number of documents listed in KPMG's

privilege log.  Some of them involve privilege claims that KPMG has since abandoned.

Others were rejected by this Court in its December 20, 2002 Memorandum Opinion.[27]

Others were not discussed in either report.[28]   Finally, KPMG did not produce a number

of documents that the Court directed it to produce to the Special Master.[29]   The Court

should order KPMG to produce to the IRS all these documents.

---

[26]December 20, 2002 Memorandum Opinion, pp. 6-9.

[27]Documents 50 (Memo, p. 15); 867 (Memo, pp. 18-19); 1028 (Memo, p. 20); 1140, 1141, 1143 and 1144 (Memo, p. 24); and 1148 (Memo, p. 21).

[28]Documents 1136, 193, and 752.

[29]Documents 11 (Final Report, p. 29), 305 and 328 (Final Report, p. 79);

- 20 -

III.

IN ANY EVENT, KPMG SHOULD PRODUCE EACH
DOCUMENT THAT DISCUSSES TAX OR LEGAL ADVICE,
WHERE THE DOCUMENT ITSELF DOES NOT INDICATE
THAT THE DISCUSSION WAS BASED UPON FACTS
<u>COMMUNICATED IN CONFIDENCE BY THE CLIENT</u>

The Special Master recommended that KPMG not be required to produce documents that discuss tax or legal advice, for which KPMG asserted either the attorney-client or the statutory "tax practitioner privilege."[30]  Because this Court discussed those privileges at pp. 8-10 of its December 20, 2002 Memorandum Opinion, we will not review it in full here.  Suffice to say that, because it held that the §7525 privilege protects confidential communications to the same extent as the attorney-client privilege, the Court discussed both privileges in the same terms.[31]

As to 141 documents, however, the Special Master failed to properly apply the attorney-client privilege and the statutory privilege, as discussed and adopted by the Court in its December 20, 2002 Opinion.   In particular, KPMG did not support with evidence, and the Special Master did not discuss or find as a fact, that any of these 141 documents discussing legal or tax advice is based upon or contains information communicated in confidence to the lawyers or tax practitioner by a client or a prospective client for the purpose of seeking legal or tax advice.

_____

[30]26 U.S.C. §7525

[31]Memorandum Opinion, December 20, 2002, p. 8.

This was error.  As the Court noted in its December 20, 2002 Memorandum Opinion, "'communications from attorney to client are shielded if they rest on confidential information obtained from the client,' and 'when an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged.'"[32] Thus, KPMG's failure to support the attorney-client privilege claims with admissible evidence is fatal to those claims.

This evidentiary failure is also fatal to KPMG's claims that these documents may be properly withheld in reliance upon the statutory privilege.  As Congress enacted in §7525, and as this Court discussed in its December 20, 2002 Memorandum Opinion, the statutory privilege that protects confidential communications from tax clients to tax practitioners is no broader than the attorney-client privilege that protects privileged communications from potential clients of a lawyer.  Without a showing that the discussion of tax advice was based upon information communicated in confidence from the client to the tax practitioner, the discussion of tax advice is not privileged.  And the Special Master cannot infer such a fact in the absence of evidence – certainly not on this record.

Perhaps as important, the Special Master did not find that the legal or tax advice discussed in any of these 141 documents was, in fact, based upon information communicated in confidence by the client or potential client to the lawyer or tax practitioner.  This, too, is fatal to KPMG's claims that these documents that, according to

---

[32]Memo, p. 9, <u>quoting</u>, <u>In re Sealed Case</u>, 737 F.2d 94, 99 (D.C. Cir. 1984).

the Special Master, "contain a discussion of tax advice" are privileged.  Just as a

lawyer's exposition on a point of law is not privileged, even when sent to a client, the

mere discussion of tax advice, without more, is not privileged.  This Court should

correct the mistake, which formed the basis for the Special Master's decision to

recommend withholding the following documents:

1163   E-mail from Evelyn Elgin, attaching memorandum to Steve Gremminger,

          discussing registration issues under §6111(c).  Neither the Report, nor the

          DeLap Declaration supporting the privilege claim, demonstrate that the e-

          mail or memorandum contain factual information communicated to

          counsel in confidence.[33]  (Also see below)

1209   8/3/98 e-mail from Evelyn Elgin and attached memorandum, discussing

          registration issues under §6111(c).  The Special Master recommended that

          the e-mail be produced, but not the attached memorandum.  Neither the

          Report, nor the DeLap Declaration supporting the privilege claim,

          demonstrate that memorandum contains factual information

          communicated to counsel in confidence.[34]

1245, 1248    8/15/98 and 7/21/99 e-mail strings concerning Quadra

                   relationship and §6111(c) registration issues.  Neither the Report,

                   nor the DeLap Declaration supporting the privilege claim,

_____

[33]Final Report, p. 13.

[34]Final Report, p.19.

demonstrate that the e-mails contain factual information

communicated to counsel in confidence.  (See below)

46     5/25/99 memo from KPMG to a client, concerning legislation.  The

Special Master recommends withholding this document because it

discusses tax advice.  But there is no evidence whatsoever that the advice

is based upon information communicated to KPMG in confidence –

indeed, KPMG did not offer any evidence to support the privilege claim as

to this document.  This is a requirement of the §7525 privilege.

76, et al.     These 51 documents, listed at p. 30 of the Final Report, reflect

communications between KPMG and clients concerning tax

matters.  But KPMG has not made any evidentiary showing that

these documents are based upon, or contain, information

communicated to KPMG in confidence by its clients.  These would

appear to be the memos of conversations that followed templates

prepared by KPMG for clients after the IRS had selected the clients

for audit.  These all appear to be post-transaction conversations as

well.

337     KPMG has not made any evidentiary showing that these documents are

based upon, or contain, information communicated to KPMG in

confidence by Jacoboni.[35]

---

[35]Final Report, p. 33.

547    2/24/99 letter from KPMG to a client, containing tax advice given to the client.  But as noted above, this is not sufficient to withhold this document. KPMG has not made any evidentiary showing that the documents is based upon, or contains, information communicated to KPMG in confidence by its client.[36]  (See below)

549, 550    Two letters from KPMG to a client, containing tax advice given to the client.  But this is not sufficient to withhold this document. KPMG has not made any evidentiary showing that the documents is based upon, or contains, information communicated to KPMG in confidence by its client.[37]  (See below)

551, 556    Same as 76, et al.[38]

555    Same as 547[39]  (See below)

558    Same as 76, et al.[40]

568, 569, 571  Same as 547[41]  (See below)

---

[36]Final Report, p. 36.

[37]Final Report, p. 37.

[38]Id.

[39]Id.

[40]Id.

[41]Id.

573     Same as 76, et al.[42]

574, 577, 578  Same as 76, et al.[43]

577     Same as 547[44]  (See below)

584-587     Same as 547[45]  (See below)

597     Same as 547 [46] (See below)

670     Same as 547[47]  (See below)

848     Same as 76, et al.[48]

849-857     Same as 547[49]  (See below)

891     Same as 547[50]  (See below)

934, 935, 939-941     Same as 76, et al.  In addition, the Final Report indicates that these documents reflect information that KPMG's clients provided to KPMG, in response to KPMG's requests for

---

[42]Final Report, p. 38.

[43]Id.

[44]Id.

[45]Final Report, p. 39.

[46]Id.

[47]Id.

[48]Final Report, p. 41.

[49]Id.

[50]Final Report, p. 43.

information.  By definition, these documents are not
privileged under §7525.[51]

955     Same as 547[52]  (See below)

956     Same as 76, et al.[53]

1073     October 9, 2001 internal KPMG e-mail, reflecting inquiry from a client's
attorney about a tax question.  There is no indication or evidence that the
e-mail contains or is based upon information communicated in confidence
by the client or the client's lawyer.[54]

1093, 1109     12/14/2000 letter from KPMG to client concerning retention of tax
records. There is no indication or evidence that the letter contains
or is based upon information communicated in confidence by the
client.[55]

846     Same as 76, et al.[56]

847, 858     E-mails between KPMG and client, cc client's attorneys, concerning
the transaction.  There is no indication or evidence that the e-mails

---

[51]Final Report, pp. 44-45.

[52]Final Report, p. 46.

[53]Id.

[54]Final Report, p. 49.

[55]Final Report, p. 50.

[56]Final Report, p. 60.

contain or are based upon information communicated in confidence by the client. In addition, disclosing any such information to an investment advisor to whom no privilege attaches waives any applicable privilege.[57]

892   E-mail between two KPMG members concerning communication with attorney R.J. Ruble and his law firm, Brown & Wood, which worked with KPMG to develop tax shelter products that KPMG marketed to multiple clients. There is no indication or evidence that the e-mail contains or is based upon information communicated in confidence by the client. The Special Master observed here that outside counsel represented the client in a tax matter – but at p. 67 of the Final Report, the Special Master found that KPMG had a marketing arrangement with the same lawyer. The ruling on this particular document misapplies the privilege, and erroneously fails to consider the marketing arrangement between KPMG and Brown & Wood.[58]

897-899, 901, 1070   Same as 892.[59]

1046   Same as 76, et al.[60]

---

[57]Final Report, p. 61.

[58]Final Report, pp. 61-62, 67.

[59]Id.

[60]Final Report, p. 70.

| 1068, 1071, 1075 | These documents concern the template that KPMG developed to provide oral tax advice to clients whose tax returns were being audited.  The Special Master found that the §7525 privilege applies, because they relate to giving tax advice.  But there is no evidence or indication that they contain or are based upon information communicated to KPMG in confidence.  Moreover, because they contain a pre-written "template" for giving advice, these documents could not possibly be based upon information that any client could have communicated in confidence to KPMG. They are not privileged.[61] |
| --- | --- |
| 1078, 1082 | Same as 76, et al.[62] |
| 1079, 1081 | Letter related to phone conversation memorialized in 1078.  There is no evidence or indication that it contains or is based upon information communicated to KPMG in confidence.[63] |
| 1084, 1085 | Memo of oral advice given by KPMG to client, and client's financial advisor.  There is no evidence that the memo contains or is based upon information communicated to KPMG in confidence.  Also, the |

[61]Final Report, pp. 70-71.

[62]Final Report, pp. 71-72.

[63]Final Report, p. 72.

presence of the client's financial advisor waives any privilege that
might otherwise have attached.[64]

1156, 1158, 1159     Same as 76, et al.  There is no evidence that the memo
contains or is based upon information communicated to
KPMG in confidence.  In addition, because the memo
concerns information related to the preparation of a tax
return, it is not privileged.[65]

1206     The Special Master has issued two conflicting recommendations on this
document, which is a duplicate of Document 1139.  At p. 84 of this Final
Report, the Special Master says this document is privileged.  At p. 86 he
says it is not privileged because it deals, "solely with business matters
and, in a generalized way, with legal norms including the need to be
specific and the need to define the relationship between the various
parties."  We submit that, as described on p. 86, it is not privileged.

1174, 1175, 1176, 1176A-C, 1177, 1250-1257, 1292

E-mail strings beginning with Evelyn Elgin, June 1998, with draft
memorandum ultimately transmitted to Steve Gremminger, discussing
registration issues under §6111(c).  Neither the Report, nor the Elgin,
DeLap or Eischeid Declarations supporting the privilege claim,

---

[64]Final Report, p. 73.

[65]Final Report, p. 74; December 20, 2002 Memorandum Opinion, p. 8.

demonstrate that the e-mail or memorandum contain factual information communicated to counsel in confidence. They simply say that the drafts were "intended to be . . . kept confidential."[66]  (Also see below)

1189    Same as 1174, et al.[67]

1249    Same as 1174, et al.[68]

1077    The Special Master has recommended withholding under §7525 a "form" memorandum intended to provide advice to clients about the FLIP/OPIS shelters. There is no evidence that this form was based upon, or contains, information communicated in confidence by a client seeking tax advice. Perhaps more importantly, KPMG seeks to assert the §7525 privilege on its own behalf. There is no indication that Congress intended to create a privilege to enable a tax practitioner to seek "confidential" tax advice from itself.[69]

For the reasons discussed above, the Court should order KPMG to produce the documents listed in this section. They are not privileged under either the attorney-client or the tax practitioner privilege.

---

[66]Final Report, pp. 87-88.

[67]Final Report, p. 88.

[68]Final Report, pp. 89-90.

[69]Final Report, pp. 90-91.

IV.

KPMG SHOULD PRODUCE DOCUMENTS THAT SUPPORT
BENEFITS CLAIMED ON TAX RETURNS FILED WITH THE IRS
AND DOCUMENTS DISCLOSED TO NON-PRIVILEGED PEOPLE

Next, the Special Master recommended that KPMG not be required to produce documents withheld on the basis of attorney-client or tax practitioner client privilege, where the Master's description indicates that the document discusses matters reported on a tax return (and, in one instance, was disclosed to a person outside the privileged relationship). As the Court held in its December 20, 2002 Memorandum Opinion, "the privilege does not protect communications between a tax practitioner and a client simply for the preparation of a tax return."[70]

The Special Master recommended that the following 28 documents be withheld, even though they support items reported on a federal income tax return, or they were disclosed to one or more persons outside the confidential relationship.. Because those documents are not privileged, the Court should order KPMG to produce them.

358    Letter from client to lawyer, seeking legal advice. This would be privileged, but the log says it was copied to a non-lawyer at KPMG, and there is no evidence the KPMG person (Mike Gray) falls within the scope of the privilege.[71]

_____

[70]December 20, 2002 Memorandum Opinion, p. 8; citing, United States v. Lawless, 709 F.2d 485, 488 (7th Cir. 1983).

[71]Final Report, p. 5.

547     2/24/99 letter from KPMG to a client, containing tax advice given to the client about a transaction reported on a filed tax return.[72]

549, 550     Two letters from KPMG to a client, containing tax advice given to the client about a transaction reported on a filed tax return.[73]

555     Same as 547[74]

558     Same as 76, et al.[75]

568, 569, 571  Same as 547[76]

577     Same as 547[77]

584-587     Same as 547[78]

597     Same as 547[79]

632     Same as 76, et al.[80]

---

[72]Final Report, p. 36.

[73]Final Report, p. 37.

[74]Id.

[75]Id.

[76]Id.

[77]Final Report, p. 38.

[78]Final Report, p. 39.

[79]Id.

[80]Id.

670      Same as 547[81]

849-857      Same as 547.   Not only do these documents concern a matter

reported on a filed tax return, they involve communications with a

non-privileged person, i.e., an investment advisor.  They are not

privileged.[82]

891      Same as 547[83]

955      Same as 547[84]

These documents are not privileged.  To the extent they might once have been

privileged, the clients have waived the privilege by claiming the tax benefits discussed

in them on filed tax returns, or by disclosing the information to a non-privileged person.

As such, the Court should order KPMG to produce them in their entirety to the IRS.

Dated: December 8, 2003                    Respectfully submitted,

                                           /s/ Stuart D. Gibson_____
                                           STUART D. GIBSON
                                           ISAAC D. PAXMAN
                                           Trial Attorneys, Tax Division
                                           U.S. Department of Justice
                                           P.O. Box 227, Ben Franklin Station
                                           Washington, D.C. 20044
                                           (202) 307-6586, 353-2260

OF COUNSEL:

ROSCOE C. HOWARD, JR.
United States Attorney

---

[81]Id.

[82]Final Report, p. 41.

[83]Final Report, p. 43.

[84]Final Report, p. 46.

<u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that the foregoing PETITIONER'S OBJECTIONS TO

REPORTS AND RECOMMENDATIONS OF SPECIAL MASTER and THIRD

DECLARATION OF MICHAEL A. HALPERT were served upon counsel for

respondent this 8th day of December, 2003, by sending copies to them by First Class

mail, postage prepaid, addressed to:


JOHN M. BRAY
King & Spalding
1730 Pennsylvania Avenue, NW
Washington, D.C. 20006


STEPHEN D. GARDNER
Kronish Lieb Weiner & Hellman
1114 Avenue of the Americas
New York, NY 10036-7798




*/s/ Stuart D. Gibson*
STUART D. GIBSON