APPENDIX A

KPMG'S INTERNAL REFERENCES TO "MARKETING" TAX SHELTERS

With respect to the FLIP and OPIS shelters, KPMG did not provide "advice and counseling on a one-on-one basis to clients and prospective clients concerning the clients' tax situations."[1]  Rather, KPMG developed two one-size-fits-all off-the-shelf products.  KPMG then marketed both products to potential clients.  Neither FLIP nor OPIS resulted from one-on-one counseling with clients.  Neither was created based on a communication from a particular client about the client's situation.  In addition to evidence already in the record, it is now easy to present a litany of comments from publically-available internal KPMG documents that make this point irrefutable (emphasis added in all quotes):

- "Just as a matter of background, in September or October of last year Bob Simon and Bob Pfaff began to have discussions on a successor to the *FLIP transaction which was being marketed.* These discussions took on an air of urgency when Larry Delap determined that *KPMG should discontinue marketing the existing product.*"[2]

- "Simon was also the one who suggested and prepared investor's representation letters which dealt primarily with the investor's economic expectations heading into the deal    Prior to that we had some 20 or so representations buried in a 50 page opinion    *Because the investor himself was not making the representations,*

---

[1] KPMG's Answer to Petition, ¶24, incorporating the Objections listed in Exhibits A - I, Supplemental Objections, ¶1.

[2] E-mail from Jeff Stein dated March 14, 1998, Subject "Simon Says", p. 6.; Minority Staff of Permanent Subcomm. on Investigations of S. Comm. on Governmental Affairs, 108th Cong., Rep. on U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals (Comm. Print 2003) Exhibit 11. (Hereinafter cited as PSI Report, Ex.)

*they were of dubious validity*   Representation letters will now be issued on all OPIS deals and wherever possible in the old FLIP deals."[3]

- In a discussion of changes in the FLIP shelter that led to the OPIS "product": "What I thought we were trying to achieve here was bringing the best minds we had in this Firm together in order to design the *best product to go to market with*"[4]

- "Should KPMG decide to begin to register its tax products, *I believe that it will position us with a severe competitive disadvantage in light of industry norms to such degree that we will not be able to compete in the tax advantaged products market*"[5]

- "While the rules are written broadly enough to arguably include OPIS and other purely tax planning products they are not easily applied to the *marketing of an idea or strategy to a client* which carries with it tax advantages."[6]

- "In summary, I believe that *the rewards of a successful marketing of the OPIS product* (and the competitive disadvantages which may result from registration) far exceed the financial exposure to penalties that may arise. Once you have had an opportunity to review this information, I request that we have a conference with the persons on the distribution list (and any other relevant parties) to come to a conclusion with respect to my recommendation. As you know, we must immediately deal with this issue in order to *proceed with the OPIS product*."[7]

---

[3]E-mail from Jeff Stein dated March 14, 1998, Subject "Simon Says", p. 8; PSI Report, Ex. 11.

[4]E-mail from Jeff Stein dated March 14, 1998, Subject "Simon Says", p. 9; PSI Report, Ex. 11.

[5]Memorandum from Greg Ritchie to Jeff Stein dated May 26, 1998, "OPIS Tax Shelter Registration", p. 2; PSI Report, Ex. 3.

[6]Memorandum from Greg Ritchie to Jeff Stein dated May 26, 1998, "OPIS Tax Shelter Registration", p. 2; PSI Report, Ex. 3.

[7]Memorandum from Greg Ritchie to Jeff Stein dated May 26, 1998, "OPIS Tax Shelter Registration", p. 3; PSI Report, Ex. 3.

- *"There will be no further proactive marketing of OPIS "*[8]

- *"Through December 31, 1998, there can be reactive marketing of OPIS…."*[9]

- "I was responsible for KPMG's position that we should not register OPIS as a tax shelter and insisted that we make the business case with DPP.  This was of *significant benefit in marketing the OPIS product* and will establish the direction with respect to KPMG's position on future tax products."[10]

- "Knowing that everyone is as excited as I am about finally reaching closure with DPP on the OPIS product, I have updated the slides that we used in Dallas so that they can be used on an interim basis in *marketing presentations*…Should a *potential buyer* wish to discuss the technical aspects at a greater depth, you should consider suggesting a conference call with me to make the best use of your time, effectively to *maximize your marketing time versus having to waste time on technical stuff.*"[11]

Thus, KPMG cannot credibly claim that it has proven the elements of the "tax practitioner privilege" established in §7525.

---

[8] E-mail from KPMG recipients dated December 7, 1998, Subject OPIS, p. 1; PSI Report, Ex. 15.

[9] E-mail from KPMG recipients dated December 7, 1998, Subject OPIS, p. 1; PSI Report, Ex. 15.

[10] Memorandum from Randy Bickman dated August 30, 1998, p. 7; PSI Report, Ex. 91.

[11] E-mail from Randall S. Bickman dated June 7, 1998, p. 1; PSI Report, Ex. 93.