# kpmgPeat Marwick LLP

To  Doug Ammerman
     Orange County

Date  August 30, 1998

From  Randy Bickham
      Silicon Valley

Steno
Ref  c:\data\ammerman.doc

cc

**Tax Products Practice**

The following summarizes my thoughts on how to best structure the PFP Tax Products Practice. The underlying logic reflects a combination of my initial views and the collective views of others within the PFP Practice based upon recent discussions.

The key points are as follows:

- Strategic Direction of the Business
- Internal Organizational Structure
- Personal Considerations

*Strategic Direction of the Business*

The goal is to create a $100 million business over a three year period built around creating and marketing "capital market-based" tax products to high wealth individuals. In reaching the $100 million, the plan is revenues of $30 million in FY'99, $60 million in FY'00, and $100 million in FY'01. As discussed later in the memo, the business model is premised on closing 100 deals annually. A business model based upon 100 deals can be developed and managed by two people. On a broad conceptual level, one person's focus must be on strategy and the development of institutional channels whereby there is a continuum of high-end tax products. The other person's focus is on optimizing and managing the PFP distribution channels.

The market for our products can be segmented as follows: products with a price-point of $250,000 to $1 million and those products with fee potentials of $1 to $5 million. The business plan assumes that the Practice will be initially created through the lower-tier priced products in that our access to this market is greater based upon the current structure of the PFP distribution network. However, in order to realize the $100 million three year plan, we must also be a significant participant in the $1 to $5 million market segment.

The structure of the existing tax products market for high-wealth individuals is extremely fragmented with no dominant market leader. Unlike the publicly-traded

**Proprietary Material**
**Confidentiality Requested**

Permanent Subcommittee on Investigations
**EXHIBIT #91**

KPMG 0026764

kpmg Peat Marwick LLP

Page 2
May 6, 2003

corporate tax products sector where the investment banking firms (e.g., Goldman Sachs and Merrill Lynch) dominate the market, there has been minimal market penetration by the existing participants in the high-wealth individual market sector. The reason for this phenomenon is that to date the high-wealth individual market has been served by small boutique tax product groups and accounting firms that are merely "dabbling" in that they are not seriously devoting resources to the effort. In light of this fragmentation, we can dominant the market in three years by investing in the organizational structure to support a $100 million business.

The business model is based upon the simple concept of investing in the development of a portfolio of elegant, high-value tax products and then maximizing the return on this investment though the PFP distribution network. The associated business strategy is premised upon two integral concepts: the establishment of strategic alliances to develop and market products and capitalizing upon the existing PFP distribution network. The conclusion to externalize substantive functions through participation in strategic alliances is based upon the premise that this approach provides the most expeditious strategy for establishing a predominant position in the targeted market. Such alliances will allow us to greatly accelerate the process of establishing a branded image for both the Practice and its products, access technical expertise not available to us internally and establish market relationships that are critical to developing the Practice.

As to branding and how we are perceived within the target market, the objective is to brand the Practice as being one which is KPMG-centric with concentric strategic alliances. These alliances will be established with institutions that have exemplary reputations in the capital transactions markets. Our ability to negotiate strategic alliances which are KPMG-centric is based upon our ability to invest the funds required to expertise and productize a large portfolio of tax products and the PFP distribution network's success to date in high-wealth individual market sector.

The existing alliances with Deutsche Bank and Brown & Wood exemplify this approach. We have used the existing OPIS product as the mechanism for establishing close strategic relationships with Deutsche Bank and with Brown & Wood at both an institutional level and with key individuals within the organizations. In that the product development focus is on products which require the use of relatively complex financial securities and third party financing, these relationships are critical to our future success. The strategy is to co-develop products with Deutsche Bank and Brown & Wood and sell into the $1 to $5 million market segment on a joint basis. I have discussed the strategy of

**Proprietary Material**
**Confidentiality Requested**

KPMG 0026765

kpmgPeat Marwick LLP

Page 3
May 6, 2003

joint development and marketing with both institutions. The respective participants from each institution has agreed to commit the resources to participate in our internal product development group as well as to become active participants in the marketing process.

Organizationally, the next level of concentric relationships is with boutique tax products groups such as Presidio Advisors. Our lead relationship at this organizational level is currently with Presidio and we expect that Presidio will continue to be our "vendor of choice". In order to insure that we have access to a portfolio of ideas, we are also establishing secondary relationships with other boutique tax products groups. The business model as it relates to these firms is akin to that of a venture capitalist. We apprise them of the products that we need to complete our product portfolio so as create a pipeline of product idea inflow to us. This model effectively replicates the economics and structure of a venture capitalist establishing an inflow of business plans from which he will choose the optimal investment opportunities. In return, these boutique groups will have access to our distribution network to in effect monetize their ideas.

From a KPMG organizational perspective, the business should be viewed as a complement and an extension of the general charter of the PFP Practice; the development of leveraged tax strategies for high-wealth individuals throughout capital investment lifecycles. Our focus is the creation of tax products for optimizing returns at end of the investment cycle, i.e., preserving accumulated wealth by tax minimization.

The Practice should be funded and managed through PFP and linked with broad organization initiatives such as FCS. As to such organizational linkages, whereas there exists no common basepoints relating to the marketing function in light of our strategy being based upon selling in to the high-wealth individual market, there could be benefits associated with a FCS linkage in the product development area. However, organizational independence is critical to our business model in light of the following considerations:

> In order to brand the Practice within the high-wealth individual market segment, we must strictly focus on this market at an organizational level and have the autonomy to negotiate alliances which solely benefit our Practice.

> We must have the independence to develop compensation policies that conform to market norms. In light of the disproportionately large profit contributions that can be realized in the tax products area, key players are highly compensated. Market norms within financial institutions are base salaries of $750,000 to $1

Proprietary Material
Confidentiality Requested

KPMG 0026766

kpmg Peat Marwick LLP

Page 4
May 6, 2003

million with significant incentive compensation packages. Accordingly, in order to maintain our core management group and to be in a position to attract quality people within the industry, we must compensate on a commensurate basis.

> We must also have the independence to directly incentivize the individuals involved in product development and marketing commensurate with their specific contributions to the profitability of the PFP Practice. The simple observation being that if we can develop a $100 million business within PFP that has 80 to 90 percent margins, all participants in the process should benefit.

*Internal Organizational Structure*

Relative to its $100 million potential, the management team needed to develop and run the business and the resources that must be deployed to support it are extraordinarily modest. The reason for this conclusion is that the business could generate $100 million in revenue based upon doing approximately 100 deals annually. Using the OPIS product as base for extrapolation, the following model can be derived to demonstrate the phenomenon based upon the assumption that future products will replicate the economics of OPIS and that we are able to effectively penetrate the $1 to $5 million dollar market segment.

| Notional Deal Amt | Number of Deals | Avg KPMG Fee | Total Revenues |
|---|---|---|---|
| $5.00 billion | 82 | $750,000 | $61,500,000 |
| $1.25 billion | 14 | $1,500,000 | $18,000,000 |
| $1.25 billion | 6 | $3,000,000 | $18,000,000 |
| $7.50 billion | 102 | | $100,500,000 |

[The current "run rate" for the OPIS product is an average KPMG fee of $750,000 per deal. If we have had a normalized sales cycle for the product this year covering 6 months, we could have closed approximately 60 deals.]

The internal operating structure to support the business must incorporate the following functions:

1. A strategic management function to define the operating strategy for the business in

Proprietary Material
Confidentiality Requested

KPMG 0026767

kpmg Peat Marwick LLP

Page 5
May 6, 2003

terms of market focus, resulting product mix, marketing plans for products (e.g., lifecycling of products, timing of replacement products, etc,)

2. A product R&D function which is based upon working with Deutsche Bank, Brown & Wood, boutique tax product groups and other institutions to develop a pipeline of product ideas for our consideration (the counterpart of the venture capitalist having a inflow of business plans to consider for investment).

3. An internal product development function which will take the selected product ideas and determine whether we can opine on the concept on a "more likely than not" basis, write the associated opinion letter, manage the opinion letter through the DPP opinion review process, and package the product for marketing. The optimal size for the group is 6 people. Once an idea has been accepted by the group, one person will be selected to be the product owner and will be responsible for taking the product through the technical review process and packaging it for marketing.

The initial thoughts on the participants in the group are:
Randy Bickham
Jeff Eischeid
Tracie Henderson
David Rivkin
Shannon Liston
Jack Nuckolls

In addition to the six permanent group members, Mark Watson should be asked to participate in order to provide a linkage to the Innovative Strategies Group. This linkage is important so as to benefit from group synergies and to avoid duplicative efforts.

4. The sales and marketing function will be effectively orchestrated through two separate groups. The PFP partner/manager group will be responsible for finding and managing the closing of deals. The CaTS group will be responsible for formal presentations of products to target buyers and supporting the PFP partner/manager group in closing deals. If the assumption is that we will close 100 deals annually, then we would need approximately 10 people in the CaTS marketing group. The assumption being that 10 people could give 150 to 200 presentations to be in a position to close 100 deals.

Proprietary Material
Confidentiality Requested

KPMG 0026768

kpmgPeat Marwick LLP

Page 6
May 6, 2003

> The initial thoughts on the CaTS group participants are:
> Randy Bickham
> Jeff Eischeid
> Tracie Henderson
> David Rivkin
> Carl Hastings
> Deke Carbo
> Dale Baumann
> Mike Watkins
> · Bob Pederson
> (TBD)

As the above discussion indicates, there are two discrete management functions that are critical to the success of our business, one with an external focus and the other internal: managing the external alliance network so as to maintain a continuum of quality product ideas/and the subsequent internal productization process and managing the CaTS/PFP distribution channel/and the internal groups which can significantly impact product distribution such as DPP. Whereas Jeff and I believe that it will take our collaborative efforts to build the business envisioned, we have concluded that I should focus on developing and managing external alliances/product development and Jeff should focus on maximizing the potential of the CaTS/PFP distribution network.

*Personal Considerations*

❖ <u>Position within the Practice</u>. I need an interim title to effectively communicate to both our joint venture partners and the market my responsibilities and level of authority within the Practice. My suggested solution is Managing Director – Capital Strategies, whereas Jeff would be the Partner-in-Charge of the CaTS group. As to a long-term solution, I assume that based upon our discussions that if the Practice grows as expected I would be offered an equity partnership position in FY '99.

❖ <u>Reporting relationships</u>. As discussed, I will report directly to you in a national role.

❖ <u>Compensation</u>. My view is that my compensation for this year is a function of two components, (1) the success of the OPIS product through the first part of October 1998 and (2) my contribution to developing a tax products business around the base

**Proprietary Material**
**Confidentiality Requested**

KPMG 0026769

kpmg Peat Marwick LLP

Page 7
May 6, 2003

that has been established with OPIS. As to the first component, please be mindful of the following observations:

- If Gregg Ritchie and I had not championed the OPIS product, neither OPIS nor the CaTS group would exist today. Gregg was critical to the process in terms of dealing with internal organizational impediments, primarily DPP. My contribution was product design and development, sufficiently differentiating the OPIS product from the FLIP product which was taken off the market by DPP. As a result of the product development process, we became the product owner as compared to the FLIP product which considered to be owned by Presidio.

- I was responsible for KPMG's position that we should not register OPIS as a tax shelter and insisted that we make the business case with DPP. This was of significant benefit in marketing the OPIS product and will establish the direction with respect to KPMG's position on future tax products.

- The PFP plan assumes $20 million of revenue from the OPIS product. One month ago, Deutsche Bank only had the capacity to do $800 million in OPIS deals, resulting in approximately $10 million in KPMG fees. Presidio was unable to negotiate additional Deutsche Bank capacity. I met with Deutsche Bank in New York and convinced them of the necessity of increasing their internal deal capacity and of the need to effectively contract capacity from another financial institution, Commerzbank. We now have the capacity to do a sufficient level of deals so as to meet plan. The existing capacity number will allow for us to generate approximately $25 million in KPMG fees.

- We have only booked $500 million in deals to date. Over the next six weeks, we must book $1.5 billion in deals to realize the $25 million in fees. It is going to take a herculean management effort by Jeff and myself to accomplish this result.

My sense of an appropriate amount of compensation for managing OPIS through the current cycle is 2.5% of the revenue generated. Consequently, should we achieve our plan number of $20 million for OPIS, I will receive a bonus of $500,000. As to my contribution in creating and managing our future tax products business, I believe that the "2.5% of revenue generated" approach is equally appropriate. To provide a perspective on evaluating "2.5% of revenue generated" in the context of the tax products business, generally there are 350-400 bps to be allocated to the institutions participating in most

**Proprietary Material
Confidentiality Requested**

KPMG 0026770

kpmg Peat Marwick LLP

Page 8
May 6, 2003

capital market-based tax products. KPMG typically is allocated 125-150 bps. The "2.5% of revenue generated" equates to less than 5 bps.

Effectively, I am willing to undertake a position which will significantly impact the profitability of the PFP Practice with a compensation package which is structured around a relatively low amount of base compensation in return for a significant incentive component. If my belief in the future of the business is correct, KPMG will become the dominant participant in a highly profitable market and I will be in a position to earn a significant level of compensation. In the event that I am wrong, KPMG has minimal downside in light of its modest investment in the venture.

**Proprietary Material**
**Confidentiality Requested**

KPMG 0026771