IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>KPMG LLP, )<br>)<br>Respondent. ) | Misc. No. 02-295 (TFH) |

### THIRD DECLARATION OF MICHAEL A. HALPERT

Pursuant to 28 U.S.C. §1746(2), Michael A. Halpert declares:

1.  I am a duly commissioned Internal Revenue Agent, employed in the Internal Revenue Service's Large and Mid-Size Business Division (LMSB), Financial Services Industry. My post of duty is in Washington, D.C.

2.  I file this declaration to supplement the information contained in my two earlier declarations filed in this case.

3.  On May 3, 2002 I issued and caused to be served upon KPMG (through its authorized representatives) a summons demanding the production of documents and testimony about transactions described in Notice 2000-44, that may have been promoted by KPMG.

4.  Except for information sought and produced pursuant to an earlier IRS summons seeking information about a KPMG-developed tax strategy called "BLIPS," at no time before August, 2003 did KPMG or any representative of KPMG disclose to me that KPMG had been involved in selling or promoting any tax shelters described in Notice 2000-44.

5. Stephen Gardner of the Kronish Leib law firm in New York City is one of the attorneys of record for KPMG in this case. He is – and has been throughout 2003 – also one of KPMG's attorneys of record in the IRS's tax shelter promoter examination of KPMG.

6. Some time in 2003 I learned from sources other than KPMG that KPMG may have developed and promoted a tax shelter called the "Short Option Strategy" (SOS). I asked KPMG to provide information about its role, if any, in developing and promoting that tax shelter.

7. On May 28, 2003, I participated in a telephone conversation with Mr. Gardner, in which he explained KPMG's role in the SOS tax shelter. Mr. Gardner initially said that KPMG did not sell or promote the SOS tax shelter, and that KPMG's role in the SOS tax shelter was limited to preparing federal income tax returns for at least two participants in the shelter. Later, in another telephone conversation, Mr. Gardner added that KPMG may have played a role in some cases in providing advice about the preparation of the SOS participants' federal income tax returns. At no time before August 2003 did Mr. Gardner represent KPMG's role in the SOS tax shelter as involving anything other than the preparation or advice about the preparation of tax returns.

8. On August 27, 2003, KPMG caused to be delivered to my office 17 boxes of documents responsive to the Notice 2000-44 Summons, pertaining to KPMG's

involvement in the SOS tax shelter. Although the Notice 2000-44 Summons also sought a list of participants, KPMG did not produce such a list on August 27, 2003.

9. On September 9, 2003, I participated in a telephone conversation with Stephen Gardner. During that conversation, Mr. Gardner advised me for the first time that KPMG had prepared a list of participants in the SOS tax shelter, but had delayed providing that list to the IRS, to enable those participants that wanted to keep the IRS from learning their identities to seek relief in the courts to prevent KPMG from disclosing their identities to the IRS. During that conversation, Mr. Gardner also said that two of those participants had the previous day sought to file suit using "John Doe" aliases, to enjoin KPMG from providing the IRS with any information about them – including their identities.

10. It was not until September 17, 2003 that KPMG produced a list of SOS customers to the IRS. That list did not include the names of the "John Does" who had filed suit.

11. On August 27, 2003, when it produced the first documents responsive to the Notice 2000-44 Summons, KPMG advised me that it was not producing all the responsive documents. KPMG has never identified what documents it was withholding, why it was withholding them, and when it would identify the withheld documents and explain the reasons for withholding them.

12. Between August 27 and September 17, 2003, KPMG produced approximately 20 boxes of documents responsive to the Notice 2000-44 Summons. I do

not know when KPMG plans to finish producing all responsive documents, and identifying all the documents it plans to withhold.

13.   Attached to this Declaration as Exhibit A is a copy of an October 1, 1997 e-mail produced by KPMG in response to the FLIP/OPIS summons. This appears to be an e-mail from Gregg Ritchie at KPMG in Los Angeles, responding to questions posed in an e-mail sent to him by Randall A. Hamilton at KPMG Des Moines on September 30, 1997. In response to Mr. Hamilton's question about whether his FLIP customer must pay a fee for the Brown & Wood legal opinion, even if the customer did not request that opinion, Mr. Ritchie states, "OUR DEAL WITH BROWN AND WOOD IS THAT IF THEIR NAME IS USED IN SELLING THE STRATEGY, THEY WILL GET A FEE. WE HAVE DECIDED AS A FIRM THAT B&W OPINION SHOULD BE GIVEN IN ALL DEALS."

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 12/4/03

Michael A. Halpert

```
Author:  Gregg W. Ritchie at KPMG_WARNER_CENTER
Date:    10/1/97  12:21 PM
Priority: Normal
TO: Randall A. Hamilton at KPMG_DES_MOINES
Subject: Re: Flip Tax Opinion
```
------------------------------- Message Contents -------------------------------

_____ Reply Separator _____
```
Subject: Flip Tax Opinion
Author:  Randall A. Hamilton at KPMG_DES_MOINES
Date:    9/30/97 2:58 PM
```

Greg, in your September 23rd cc:mail message which attached the September status memo, you indicated in paragraph 3(b) the fact pattern must also be concurrently sent to R. J. Ruble at Brown and Wood. You had previously indicated to me that we would not need to request the Brown and Wood opinion unless the client specifically requested it. At this time the client has only request our opinion but is aware that the Brown and Wood firm would issue the opinion if requested. Why are we now requiring this concurring opinion?

IF WE ARE FOUND TO BE A PROMOTER OF A TAX SHELTER, THE CLIENT IS NOT PROTECTED FROM 6662 PENALTIES BY RELIANCE ON OUR OPINION ONLY. ALSO, OUR DEAL WITH BROWN AND WOOD IS THAT IF THEIR NAME IS USED IN SELLING THE STRATEGY, THEY WILL GET A FEE. WE HAVE DECIDED AS A FIRM THAT B&W OPINION SHOULD BE GIVEN IN ALL DEALS. IF YOU DID A QUADRA DEAL, OUR SHARE OF THIS COST IS $25K. IF YOU DID A DEAL THROUGH PRESIDIO, THE COST IS ALREADY BUILT IN TO THE FEE SCHEDULE.

With respect to your status memo, one question that I have is, should all hours incurred be split between the international contract and the PFP contract? This was not real clear under Section 10 since Section 10(c) indicated that all expenses relative to the engagement will be split in the same ratio. It is not clear whether that includes chargeable hours.

YES. SINCE WE ARE SPLITTING THE REVENUE BETWEEN THE IS AND PFP, ALL COSTS (TIME AND EXPENSE) SHOULD ALSO BE SPLIT EQUALLY.

In Section 5 of your memo, you indicated clients must sign the standardized engagement letter that was attached. While the engagement letter that our client signed is not absolutely identical, it is largely identical and was previously approved by Larry DeLap. I would assume that would be sufficient at this time since the engagement letter was signed in mid-August and our transaction is in mid stream at this time.

YOU ARE FINE IF YOU HAVE ALREADY HAD THE CLIENT EXECUTE AN ENGAGEMENT LETTER. MY MEMO RELATES TO FUTURE DEALS AND EMPHACIZES THAT CLIENTS MAY NOT CHANGE THE LANGUAGE TO FIT THEIR NEEDS WITHOUT APPROVAL FROM DELAP.



644531